**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **DEVOTION HOSPICE, LLC, BRITE HOSPICE, INC., DIAMOND HOSPICE, LLC, DEVOTION HEALTHCARE, INC., SHAWN L. STEVENS, AND GEOFFREY A. STEVENS,** | § § § § § § | |
| **Plaintiffs,** | § § | **Civil Action No. 4:24-cv-2531** |
| **v.** | § § | **Jury** |
| **QFS CAPITAL, LLC, ANDI MUMXHIU, ROBERT P. RAMPULLA, SYDNEY L. LYONS, BENJAMIN HINKE, ECP SOLUTIONS, ECP LENDING, ECP BUSINESS CAPITAL, CHRIS JAMES, AND JOHN AND JANE DOE INVESTORS AND OWNERS,** | § § § § § § § § § | |
| **Defendants.** | § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

Plaintiffs Devotion Hospice, LLC, Brite Hospice, Inc., Diamond Hospice, LLC, Devotion Healthcare, Inc. (all four collectively "Devotion"), Shawn L. Stevens ("Ms. Stevens"), and Geoffrey A. Stevens ("Mr. Stevens") (and collectively "Plaintiffs") set out their complaints against Defendants QFS Capital, LLC, Andi Mumxhiu, Benjamin Hinke, Robert P. Rampulla, Sydney L. Lyons, ECP Solutions, ECP Lending, ECP Business Capital, Chris James, and John and Jane Doe Investors.

## INTRODUCTION

This is an action for violations of the Racketeer Influenced and Corruption Organizations Act, 18 U.S.C. §§ 1961-68 ("RICO") brought by Plaintiffs against Defendants QFS Capital, LLC, an alleged merchant cash advance company (hereinafter "QFS" or "the MCA"), Andi Mumxhiu ("Mumxhiu"), Robert P. Rampulla ("Rampulla"), and Sydney Lyons ("Lyons"), all of whom are

associated with the MCA, John and Jane Doe Investors and/or Funding Partners in the MCA (the "Investors"), ECP Solutions, ECP Lending, ECP Business Capital, and Chris James ("James")(collectively the "Brokers" and all of the Defendants together are "the Enterprise") arising from the Enterprise's unconscionable and fraudulent agreement to collect on an unlawful debt.

This RICO action is based on a "Merchant Agreement" (the "MCA Agreement") pursuant to which QFS purportedly paid funds to allegedly purchase Devotion's future receivables at a discount and Devotion agreed to repay the face value of its receipts through daily payments.

While couched as the purchase of future receipts, the MCA Agreement's terms and conditions, as well as the Defendants' actions since that time, demonstrate that despite the disclaimers in the MCA Agreement and the guaranty, no sale of receipts ever took place, and the form was merely a sham intended to evade the applicable usury laws.

QFS's alleged risk in the transaction was negligible because Devotion, as the borrower, always remained liable for the debt and Devotion and/or Mr. and Ms. Stevens (as the guarantors) bore the risk of non-payment, while QFS only bore the risk that the non-payment of receivables would leave Devotion unable to pay on the loan, at which point QFS would go after the guarantors. As a result, the MCA never made a bona fide purchase of Devotion's receivables under the MCA Agreement and the transaction is, in reality, a loan.

Specifically, Devotion borrowed (and Ms. and Mr. Stevens guaranteed) a net total of $815,425.74, which required 151 daily payments of $8,496.80, for a total amount owed of $1,286,655.97.  This transaction was a usurious loan for which Devotion has been charged an interest rate of more than **170.5%,** which is far greater than the maximum 25% interest rate for commercial loans permitted under New York law.

Plaintiffs have now learned that this arrangement with QFS was made based on Defendants' fraudulent statements and that the entire nature of the transaction was misrepresented, usurious, and violates RICO, and thus is unenforceable.  It is against this backdrop that Plaintiffs file this Complaint.

## PARTIES

1.      Plaintiff Devotion Hospice, LLC is a Texas limited liability company located in Conroe, Texas, which is represented by the undersigned counsel.

2.      Plaintiff Brite Hospice, Inc. is a Texas corporation located in Conroe, Texas, which is represented by the undersigned counsel.

3.      Plaintiff Diamond Hospice, LLC is a Texas limited liability company located in Conroe, Texas, which is represented by the undersigned counsel.

4.      Plaintiff Devotion Healthcare Inc. is a Texas corporation located in Conroe, Texas, which is represented by the undersigned counsel.

5.      Plaintiff Shawn L. Stevens, a resident of Harris County, Texas, is represented by the undersigned counsel.

6.      Plaintiff Geoffrey A. Stevens, a resident of Harris County, Texas, is represented by the undersigned counsel.

7.      Defendant QFS Capital, LLC is a Delaware limited liability company.  QFS extends usurious loans, masked as "purchases" of small businesses' accounts receivable, in flagrant violation of the applicable state usury law.

8.      Defendant Andi Mumxhiu is QFS's collection manager.

9.      Defendant Benjamin Hinke is QFS's manager and director of finance and accounting.

10.     Defendant Robert P. Rampulla is a QFS portfolio manager.

11.     Defendant Sydney L. Lyons is QFS's customer service specialist..

12.     John and Jane Does Investors and Owners are persons or entities currently unknown to Plaintiffs that own and/or provided funds to QFS, and Plaintiffs have thus sued said Defendants with fictitious names.

13.     Defendant ECP Solutions is a company affiliated with Defendant Chris James that assisted in the brokering of the usurious loan to Devotion.

14.     Defendant ECP Lending is a company affiliated with Defendant Chris James that assisted in the brokering of the usurious loan to Devotion.

15.     Defendant ECP Business Capital is a company affiliated with Defendant Chris James that assisted in the brokering of the usurious loan to Devotion.

16.     Defendant Chris James introduced Plaintiffs to QFS and used his sham businesses, Defendants ECP Solutions, ECP Lending, and ECP Business Capital (collectively, "ECP"), to "broker" the transaction between Plaintiffs and QFS.

## **VENUE AND JURISDICTION**

17.     This Court has subject-matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1331 based on Plaintiffs' claims for violations of the Racketeer Influenced and Corruption Organizations Act, 18 U.S.C. §§ 1961-68 ("RICO").

18.     The Court has subject-matter jurisdiction over Plaintiffs' state-law claims because they are so related to Plaintiffs' federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

19.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

20.     This Court has personal jurisdiction over QFS because it entered into the MCA Agreement and guaranty at issue with Plaintiffs, which are Texas residents and the basis for Plaintiffs' claims are the MCA Agreement and guaranty, and QFS engaged in an unlawful conspiracy both inside and outside Texas which had the effect of harming the Plaintiffs, all Texas residents, in Texas and that this harm in Texas was foreseeable.  Further, QFS demanded and obtained access to Plaintiffs' various bank accounts, all of which were located in branches of a bank in Texas.

21.     The Court has personal jurisdiction over the remaining Defendants because they engaged in an unlawful conspiracy both inside and outside Texas, which had the effect of harming the Plaintiffs, Texas residents, in Texas and this harm in Texas was foreseeable.  Among other things, James and the ECP companies affiliated with him, had numerous contacts with Plaintiffs in Texas, including numerous contacts with Plaintiffs regarding the MCA Agreement and guaranty on which this case is based.

22.     The amount at issue and subject to the MCA Agreement exceeds $75,000.00.

## BACKGROUND OF THE MCA INDUSTRY

### A.     The Predatory MCA Industry.

12.     As Bloomberg News has reported, the MCA industry is "essentially payday lending for businesses," and "interest rates can exceed 500 percent a year, or 50 to 100 times higher than a bank's."[1]  The MCA industry is a breeding ground for "brokers convicted of stock scams, insider trading, embezzlement, gambling, and dealing ecstasy."[2]  As one of these brokers admitted, the

---

[1]    Zeke Faux and Dune Lawrence, *Is OnDeck Capital the Next Generation of Lender or Boiler Room?*, BLOOMBERG  (Nov.  13,  2014,  6:07  AM),  https://www.bloomberg.com/news/articles/2014-11-13/ondeck-ipo-shady-brokers-add-risk-in-high-interest-loans.

[2]    *Id.*

"industry is absolutely crazy ….  There's lots of people who've been banned from brokerage. There's no license you need to file for.  It's pretty much unregulated."[3]

13.     The National Consumer Law Center has also recognized that the lending practices of MCAs are predatory because the transactions are underwritten based on the ability to collect rather than the ability of the borrower to repay without going out of business.

14.     One reason for this is that MCA companies "receive the bulk of their revenues from the origination process rather than from performance of the loan [and thus] may have weaker incentives to properly ensure long-term affordability, just as pre-2008 mortgage lenders did."  *Id.* (noting that "a fundamental characteristic of predatory lending is the aggressive marketing of credit to prospective borrowers who simply cannot afford the credit on the terms being offered. Typically, such credit is underwritten predominantly on the basis of liquidation value of the collateral, without regard to the borrower's ability to service and repay the loan according to its terms absent resorting to that collateral.").

**B.     MCA Lenders Take a Number of Steps to Disguise Their Loans.**

15.     To facilitate their predatory conduct, MCA lenders make every effort to disguise MCA agreements as the "purchase" of receivables or future revenue streams when they are in fact illegal usurious loans.

16.     MCA lenders use the false guise of their alleged purchase of receivables or future revenue streams to evade state usury laws.

17.     The MCA agreements also go out of their way to expressly (but falsely) assert that the transactions subject to the MCA agreements are not loans.  Indeed, courts have ruled such disclaimers (and other characteristics) are not enough to transform these transactions from usurious

---

[3]     *Id.*

loans to other, nonregulated arrangements, the MCA lenders go to extraordinary lengths to alter the language in their MCA agreements in an attempt to avoid state usury laws.

18.     Despite the MCA lenders' ongoing evasive efforts, the true nature of these transactions remains the same.  The "merchants" and their guarantors remain the only parties with actual risk in the transactions as the MCA lenders embed the agreements with a plethora of tactics, devices, and remedies to ensure that they will be repaid at grossly inflated rates one way or another.

19.     The MCA companies only care about whether they can collect upon default or nonpayment, and not whether the small businesses on which they prey are able to survive.

**C.      MCA Agreements are Substantively and Procedurally Unconscionable.**

20.     MCA Agreements are unconscionable contracts of adhesion that are not negotiated at arms-length (despite frequently including written disclaimers to the contrary), but, instead, target and prey on small businesses that are otherwise facing a cash crunch and possible closure.

21.     Further, these MCA Agreements contain a number of one-sided terms that prey upon the desperation of the small business and their individual owners and help conceal the fact that the transactions, including those involving the Plaintiffs, are in reality loans.

22.     Among the one-sided terms typically included in MCA Agreements are:   (1) a provision giving the MCA company the irrevocable right to withdraw money directly from the merchant's bank accounts, including collecting checks and signing invoices in the merchant's name; (2) a provision preventing the merchant from transferring, moving, or selling its business or any of its assets without permission from the MCA company; (3) a one-sided attorneys' fees provision obligating the merchant to pay the MCA company's attorneys' fees but not the other way around; (4) a venue and choice-of-law provision which purports to require the merchant to litigate in a foreign jurisdiction under the laws of a foreign jurisdiction; (5) an absolute and unconditional

personal guarantee of all of the merchant's obligations; (6) a jury trial waiver; (7) a class action waiver; (8) an agreement to provide a U.C.C. lien over the merchant's assets; and (9) a prohibition of obtaining financing from any other source.

23.    All of the foregoing terms were included in the December 26, 2023 MCA Agreement that Devotion entered into with QFS.

## FACTUAL BACKGROUND OF THIS DISPUTE

### D.    The Underwriting Process Shows the Transaction is a Usurious Loan.

24.    Beginning in November of 2023, Devotion and Mr. and Ms. Stevens worked with James and his affiliated ECP companies to broker and obtain the loan from QFS in order to consolidate earlier, and now Plaintiffs have learned, usurious loans that Devotion previously entered into.

25.    During the period when James and ECP were brokering the transaction with QFS, James frequently referred to the upcoming QFS transaction as a loan.

26.    Moreover, the Enterprise demonstrated *via* its underwriting practices that the QFS transaction was a loan, and not a merchant cash advance.  Typically, banks and other legitimate institutions that purchase receivables perform extensive due diligence into the creditworthiness of the third parties whose receivables are allegedly being purchased.  When underwriting this transaction, however, the Enterprise did, at most, a cursory evaluation of Devotion's receivables, which are the assets the Enterprise fraudulently claimed were being purchased, and the Enterprise instead focused almost exclusively on Devotion's credit rating and bank balances.

27.    Indeed, QFS's website trumpets its truncated "underwriting" process, proclaiming that "QFS Capital is known for getting an offer or decline out in under 3 hours from time of

submission!"  Such a statement underscores the lack of meaningful underwriting or any concern regarding whether a business is actually in a position to repay the sums at issue.

### E.     Other Evidence Demonstrates that the Transaction Is a Usurious Loan.

28.     Via the MCA Agreement and other documents, which are dated December 26, 2023 Agreement, the MCA was to provide Devotion a net total of $815,425.74 and required 151 daily payments of $8,496.80, for a total amount owed of $1,286,655.97.

29.     Pursuant to the transaction, Devotion has been charged an interest rate of more than **170.5%,** which is far greater than the maximum 25% interest rate for commercial loans permitted under New York law.

30.     Thus, like many MCA companies, QFS and the Enterprise took advantage of Devotion, a cash-strapped business that needed additional financing quickly.

31.     Although the MCA Agreement is titled a "Merchant Agreement," and purports to represent the sale and purchase of Devotion's future receivables, the Enterprise markets, underwrites, and collects upon its transactions as loans, with interest rates far above those permissible under state law, in this case, New York law.

32.     On its website, QFS clearly holds itself out as a lender.  For example, QFS's website provides that "QFS Capital's unique guidelines enable us to give approvals other **lenders** simply can't."  (emphasis added).

33.     QFS's website also reveals that "QFS Capital prides itself on **rates** and terms competitive with even the largest business **lending** institutions."  (emphasis added).

34.     The amount provided by QFS under the MCA Agreement was to be staged pursuant to another one of the December 26, 2023, documents, entitled a "Deployment Schedule."

35.     QFS ultimately loaned Devotion $383,726.40 and was repaid $416,451.60 before Devotion refused to take any more funds from QFS because Devotion was unable to keep up with the payments.

36.     After Devotion refused to accept any more funds, QFS threatened litigation, again, a position consistent with a loan rather than a purchase of future receivables.

37.     Upon information and belief, QFS has also filed a U.C.C. lien against Devotion and Mr. and Ms. Stevens, as a secured creditor, which is consistent only with a loan arrangement.

**F.     The MCA Agreement Is One-Sided and Unconscionable.**

38.     The MCA Agreement also includes a number of other, one-sided provisions:  (1) a schedule setting forth a number of so-called fees that Devotion was required to pay upon the occurrence of certain events, for example, a "stacking fee" if Devotion obtained any other financing; (2) a prohibition against the diversion of any funds in Devotion's listed bank accounts; (3) requiring Devotion to give QFS advance permission to contact any current or former bank of Devotion's to obtain any information QFS wanted; (4) allowing QFS to review any information in Devotion's bank accounts using any fraud detection or other technology; (5) granting QFS the right to enter Devotion's business premises to check Devotion's processing terminals to ensure Devotion is not violating the MCA Agreement; (6) granting QFS access to all of Devotion's employees and records; (7) requiring Devotion to provide information about its vendors, landlord, and business operations so that QFS could "interview" such parties; (8) requiring Devotion to give QFS permission to contact any of Devotion's employees, agents, or affiliates regarding the MCA Agreement or any other business transaction; and (9) requiring Devotion to keep the MCA Agreement confidential.

39.     The guaranty is similarly unconscionable, for example, by requiring the guarantors to pay for any amount that QFS might be required to return in the event that either Devotion and/or its guarantors are subject to a bankruptcy proceeding and requiring the guarantors to perform without first requiring QFS to provide them with notice of material changes, failures to perform, renewals or modifications to the MCA Agreement, and/or any other extension of additional funds to Devotion.

40.     The MCA Agreement and guaranty are also unconscionable because they contain false statements that:  (1) the transaction is not a loan; and (2) the daily payment reflects a good faith estimate of Devotion's receivables.

41.     In addition, the MCA Agreement is unconscionable because it is designed to fail and cause Devotion to default.  Among other things, the MCA Agreement is designed to result in a default in the event that Devotion's business suffers any downturn in revenues by:  (1) preventing Devotion from obtaining any other financing at all; and (2) requiring Devotion to continuously represent and warrant that there has been no material adverse changes, financial or otherwise, in its condition, operation, or ownership.

42.     Devotion, as borrower, and Mr. and Ms. Stevens, as guarantors, thus fell victim to all of these predatory tactics when agreeing to the loan with the MCA.

**G.     The Enterprise Took Other Steps to Intentionally Disguise the True Nature of the Transactions.**

43.     Despite its disclaimers, the transaction between Devotion and QFS is, in economic reality, a loan that is absolutely repayable.   Among other hallmarks of the fact that this transaction is really a loan are:

> (a)     The daily payments required by the MCA Agreement were fixed and the so-called reconciliation provision was a mere subterfuge to avoid New York's

usury laws.  Rather, just like any other loan, the purchased amount was to be repaid within a specified time;

(b)      The default and remedy provisions purported to hold Devotion absolutely liable for repayment of the purchased amount.   The loan sought to obligate Devotion to ensure sufficient funds were maintained in a designated account to make the daily payments;

(c)      While the MCA Agreement purported to "assign" all of Devotion's future account receivables to the Enterprise until the purchased  amount is paid, Devotion retained all the indicia and obligations related to the ownership of its account receivables, including the duty to collect, possess and use the proceeds thereof.  Indeed, rather than purchasing receivables, the Enterprise merely acquired a security interest in Devotion's accounts to secure payment of the loaned amount;

(d)      Unlike true receivable purchase transactions, the MCA Agreement was underwritten based upon an assessment of Devotion's credit worthiness, and not the creditworthiness of any account debtor;

(e)      The purchased amount was not calculated based upon the fair market value of Devotion's future receivables, but rather was unilaterally dictated by the Enterprise based upon the interest rate they wanted to be paid.  Indeed, as part of the underwriting process, the Enterprise did not request any information concerning Devotion's account debtors upon which to make a fair market determination of the value of the receivables;

(f)      The amount of the daily payments was determined based upon when the Enterprise wanted to be paid, and not based upon any good-faith estimate of Devotion's future account receivables;

(g)      The Enterprise assumed no risk of loss due to Devotion's failure to generate sufficient receivables because the failure to maintain sufficient funds in the Account constituted a breach;

(h)      The Enterprise required that Devotion undertake certain affirmative obligations and make certain representations and warranties that were aimed at ensuring Devotion would continue to operate and generate receivables and a breach of such obligations, representations, and warranties constituted a default, which fully protected the Enterprise from any risk of loss resulting from Devotion's failure to generate and collect receivables.

(i)      The Enterprise required that Devotion grant it a security interest in Devotion's receivables and other intangibles and, further that the individual owners, Mr. and Ms. Stevens,  personally guarantee the performance of the representations, warranties and covenants, which the Enterprise knew were breached from day one.

**H.     The Defendants Also Used a Sham Reconciliation Provision to Disguise the Loan.**

44.     In order to evade state usury laws, the MCA Agreement contained a sham reconciliation provision to give the appearance that the loan does not have a definite term.

45.     Under a legitimate reconciliation provision, if a merchant pays more through its fixed weekly payments than it actually received in receivables, the merchant is entitled to seek the repayment of any excess money paid.  Thus, if income decreases, so do the payments.

46.     Upon information and belief, QFS does not even have a reconciliation department and instituted a deployment schedule so that QFS does not front funds ahead of Devotion's daily payments and further, did not allow Devotion to return any funds to vendors.

47.     Mr. and Ms. Stevens and Devotion recently learned that courts have ruled that MCA Agreements like this one are fraudulent and unconscionable agreements and that merchant cash advance participants violate RICO when conducting their business.  As a result, Devotion and Mr. and Ms. Stevens commenced this lawsuit.

## FIRST CAUSE OF ACTION
### (RICO: 18 U.S.C. § 1962)

48.     Plaintiffs repeat and reallege all of the paragraphs in the Complaint as though set forth here.

**A.     The Unlawful Activity.**

49.     There are two predicate acts underlying the First and Second Causes of Action. First, the making of unlawful debts and second, the engagement in wire fraud.

50.     As set forth more fully above, despite the many false statements and contract terms to the contrary, the financial arrangement between QFS and Devotion was a loan, and not a merchant cash advance.

51.     More than a dozen states, including New York, place limits on the amount of interest that can be charged in connection with providing a business loan.  In New York, that limit on business loans is 25%.

52.     Here, the interest rate that Devotion was paying on the loan was **170.5%**.

53.     The disclosures Defendants made about the loan are clearly fraudulent (for example, the MCA Agreement's representation that this arrangement is not a loan).  This loan violates New York usury law, as set forth more fully herein.

**B.      Culpable Persons.**

54.     Defendants are all "persons" within the meaning of  18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c) in that each is either an individual, corporation, or limited liability company capable of holding a legal interest in property.

55.     At all relevant times, each of James, Mumxhiu, Hinke, Rampulla, Lyons, and the John and Jane Doe Investors was, and is, a person that exists separate and distinct from the Enterprise, described below.

56.     Upon information and belief, James and his affiliated companies, ECP Solutions, ECP Lending, ECP Business Capital, brokered the usurious loan and they were paid by QFS for their improper and illegal acts to facilitate the usurious loan.

57.     The John and Jane Doe Investors are individuals and business entities that provide funding for illegal and grossly usurious loans, including this one.

58.     Through their operation of and engagement with QFS, the foregoing Culpable Persons solicit, underwrite, fund, service, and  collect upon unlawful debt incurred  by small businesses like Devotion.

**C.      The Enterprise.**

59.      Defendants all constitute an Enterprise (the "Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

60.      Defendants are associated in fact and through relations with one another for the common purpose of carrying on an ongoing unlawful enterprise.  Specifically, the Enterprise has a common goal of soliciting, funding, servicing, and collecting upon usurious loans that charge interest greatly in excess of the permitted interest rate under the laws of New York.

61.      Since at least 2022 and continuing through the present, the members of the Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreement relating to and for the purpose of originating, underwriting, servicing and collecting upon unlawful debt issued by the Enterprise to small businesses throughout the United States.

62.      The debt evidenced by Devotion's MCA Agreement constitutes unlawful debt within the meaning of 18 U.S.C. § 1962(c) and (d) 18 U.S.C. § 1961(6) because:  (a) it violates the applicable criminal usury statutes; and (b) the rates are more than six times the legal rate permitted under New York law.

63.      Since at least 2022 and continuing through the present, the members of the Enterprise have had ongoing relations with each other through common control/ownership, shared personnel, and/or one or more contracts or agreement relating to and for the purpose of collecting upon fraudulent fees through electronic wires.

64.      The Enterprise's misconduct also constitutes "fraud by wire" within the meaning of  18 U.S.C. § 1343, which is "racketeering activity" as defined by 18 U.S.C. § 1961(1).  Its

repeated and continuous use of such conduct to participate in the affairs of the Enterprise constitutions a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

> **D.     The Roles of the RICO Persons in Operating the Enterprise, and the Roles of the Individual Companies Within the Enterprise.**

65.     The RICO Persons have organized themselves and the Enterprise into a cohesive group with specific and assigned responsibilities and a command structure to operate as a unit in order to accomplish the common goals and purposes of collecting upon unlawful debts including as follows:

> **i.     QFS**

66.     QFS, upon information and belief, maintains officers, books, records, and bank accounts independent of the other Defendants, including, the John and Jane Doe Investors.

67.     James, Mumxhiu, Hinke, Rampulla, Lyons, ECP Solutions, ECP Lending, ECP Business Capital, James, and the John and Jane Doe Investors and Owners have operated or engaged with QFS as part of an unlawful enterprise to collect upon unlawful debt and commit wire fraud.

68.     Pursuant to its membership in the Enterprise, the MCA has:   (i) entered into contracts with brokers such as James, ECP Solutions, ECP Lending, ECP Business Capital to solicit borrowers for the Enterprise's usurious loans and participation agreement with the John and Jane Doe Investors to fund the usurious loans; (ii) pooled the funds of John and Jane Doe Investors in order to fund each usurious loan; (iii) underwritten the usurious loans and determining the ultimate rate of usurious interest to be charged under each loan; (iv) entered into so-called merchant agreements on behalf of the Enterprise to memorialize the usurious loans; (v) serviced the usurious loans; and (vi) set-up and implemented the ACH withdrawals used by the Enterprise to collect upon the unlawful debts.

69.     In this case, QFS, through Mumxhiu, Rampulla, Lyons, ECP Solutions, ECP Lending, ECP Business Capital, and the John and Jane Doe Investors:  (i) solicited borrowers; (ii) collected and pooled funds from Investors to fund the MCA Agreement; (iii) decided to proceed with the MCA Agreement; (iv) entered into the MCA Agreement; (v) collected upon the unlawful debt evidenced by the MCA Agreement by effecting daily ACH withdrawals from Devotion's bank accounts; and (vi) engaged in other collection activities on behalf of QFS.

### ii.     The Brokers.

70.     James, ECP Solutions, ECP Lending, ECP Business Capital acted as brokers for the placement of the usurious loan and, upon information and belief, were paid to broker the illegal loan between QFS and Devotion.  Among other things, the brokers:  (i) solicited and introduced Devotion and Ms. and Mr. Stevens to QFS; (ii) facilitated the usurious loan transaction; (iii) represented to Plaintiffs that the QFS transaction was a loan; and (iv) solicited and gathered information from Plaintiffs to assist in the completion of the usurious loan transaction.

### iii.    The Employees or Associates of QFS.

71.     Mumxhiu is QFS's collections manager, Hinke is in QFS's collections department, and Rampulla and Lyons are also affiliated with QFS.  As a result of their affiliations, these four individuals have also facilitated the usurious loan, the Enterprise, and for Mumxhiu and Hinke, improper collection of the usurious loan.

### iv.    The John and Jane Doe Investors.

72.     The John and Jane Doe Investors and Owners are, upon information and belief, a group of organizations and individual investors who maintain separate officers, books, records, and bank accounts independent of QFS.

73.     Directly and through their members, agent officers, and/or employees, the Investors have been and continue to be responsible for providing QFS with all or a portion of the pooled funds necessary to fund the usurious loans, including the Agreement with Devotion, and to approve and ratify the Enterprise's efforts to collect upon the unlawful debts by, among other things, approving early payoff terms, settlement agreement and other financial arrangements with borrowers to collect upon the unlawful debts.

74.     The Investors ultimately benefit from the Enterprise's unlawful activity when the proceeds of the collection of unlawful debts are funneled to the Investors according to their level of participation in the usurious loans.

### v.      The John and Jane Doe Owner(s).

75.     Upon information and belief, the John and Jane Doe Owner(s) of QFS are the masterminds of the Enterprise.    They are responsible for the day-to-day operations of the Enterprise and have final say on all business decisions of the Enterprise including, without limitation, which usurious loans the Enterprise will fund, how such loans will be funded, which of Investors will fund each loan, and the ultimate payment terms, amount and period of each usurious loan.

76.     In their capacity as the mastermind of the Enterprise, the John and Jane Doe Owner(s) are responsible  for creating, approving and implementing the policies, practices and instrumentalities used by the Enterprise to accomplish its common goals and purposes including: (i) the form of merchant agreement used by the Enterprise to attempt to disguise the unlawful loans as a receivable purchase agreement to avoid applicable usury laws and conceal the Enterprise's collection of an unlawful debt; and (ii) the method of collecting the daily payments *via* ACH

withdrawals.  All such forms were used to make and collect upon the unlawful loans including, without limitation, loans extended to Devotion.

77.     The John and Jane Doe Owner(s) have also taken actions and, directed other members of the Enterprise to take actions necessary to accomplish the overall goals and purposes of the Enterprise, including directing the affairs of the Enterprise, funding the Enterprise, directing members of the  Enterprise to collect upon the unlawful loans and executing legal documents in support of the Enterprise.

78.     The John and Jane Doe Owner(s) ultimately benefited from the Enterprise's funneling of the usurious  loan proceeds to QFS and to the John and Jane Doe Investors.

**E.      Interstate Commerce.**

79.     The Enterprise is engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily business activities.

80.     Specifically, members of the Enterprise maintain offices in New York and use personnel in these offices to originate, underwrite, fund, service and collect upon the usurious loans made by the Enterprise to entities in Texas, including Devotion, and throughout the United States *via* extensive use of interstate emails, mail, wire transfers and bank  withdrawals processed through an automated clearing house.

81.     In the present case, all communications between the members of the Enterprise and Devotion were by interstate email and mail, wire transfers or ACH debits and other interstate wire communications.   Specifically, the Enterprise used interstate emails to originate, underwrite, service and collect upon the MCA Agreement, fund the advance under the Agreement, and collect the daily payments *via* interstate electronic ACH debits.

**F.**     **Injury and Causation.**

82.     Plaintiffs have and will continue to be injured in their business and property by reason of the Enterprise's violations of 18 U.S.C. § 1962(c).

83.     The injuries to the Plaintiffs directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to, thousands of dollars in improperly collected criminally usurious loan payments.

84.     Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

85.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from Defendants.

**SECOND CAUSE OF ACTION**
**(Conspiracy under 18 U.S.C. § 1962(d))**

86.     Plaintiffs repeat and reallege all of the paragraphs in Complaint as though set forth herein.

87.     Defendants have unlawfully, knowingly, and willfully, combined, conspired, confederated, and agreed together to violate 18 U.S.C. § 1962(c) as describe above, in violation of 18 U.S.C. § 1962(d).

88.     By and through each of the Defendants' business relationships with one another, their close coordination with one another in the affairs of the Enterprise, and frequent email and other communications among the Defendants concerning the underwriting, funding, servicing, and collection of the unlawful loan, including the MCA Agreement, each Defendant knew the nature of the Enterprise and each Defendant knew that the Enterprise extended beyond each Defendant's individual role.  Moreover, through the same connections and coordination, each Defendant knew

that the other Defendants were engaged in a conspiracy to collect upon unlawful debts in violation of 18 U.S.C. § 1962(c).

89.    Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to collect upon unlawful debts, including the MCA Agreement, in violation of 18 U.S.C. § 1962(c).   In particular, each Defendant was a knowing, willing, and active participant in the Enterprise and its affairs, and each of the Defendants shared a common purpose, namely, the orchestration, planning, preparation, and execution of the scheme to solicit, underwrite, fund and collect upon unlawful debts, including the loan to Devotion under the MCA Agreement.

90.    Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to commit wire fraud through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

91.    The participation and agreement of each Defendant was necessary to allow the commission of this scheme.

92.    Plaintiffs have been and will continue to be injured in their business and property by reason of the Defendants' violations of 18 U.S.C. § 1962(d), in an amount to be determined at trial.

93.    Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to commit wire fraud through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

94.    The participation and agreement of each Defendant was necessary to allow the commission of this scheme.

95.     Plaintiffs have been and will continue to be injured in their business and property by reason of the Defendants' violations of 18 U.S.C. § 1962(d), in an amount to be determined at trial.

96.     The injuries to the Plaintiffs directly, proximately, and reasonably foreseeably resulting from or cause these violations of 18 U.S.C. § 1962(d) include, but are not limited to, thousands of dollars in improperly collected loan payments.

97.     Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

98.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from the Defendants.

99.     Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to commit wire fraud through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

100.    The participation and agreement of each Defendant was necessary to allow the commission of this scheme.

101.    Plaintiffs have been and will continue to be injured in their business and property by reason of the Defendants' violations of 18 U.S.C. § 1962(d), in an amount to be determined at trial.

102.    The injuries to the Plaintiffs directly, proximately, and reasonably foreseeably resulting from or cause these violations of 18 U.S.C. § 1962(d) include, but are not limited to, thousands of dollars in improperly collected loan payments.

103.    Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

104.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from the Defendants.

### THIRD CAUSE OF ACTION
**(Declaratory Judgment)**

105.    Plaintiffs repeat and reallege all of the paragraphs in the Complaint as though fully set forth herein.

106.    An actual controversy exists regarding the unconscionability and unlawfulness of the MCA Agreement with Defendants.

107.    Plaintiffs are therefore seeking from the Court a declaration that for the reasons set forth herein, the MCA Agreement with Defendants is both unconscionable and unlawful, and therefore is void and unenforceable.

108.    Plaintiffs are also seeking a declaration that the MCA Agreement is a usurious loan in violation of the laws of New York and is thus void and unenforceable.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment in their favor against Defendants, jointly and severally, and seek an Order:

    a)    Declaring that Plaintiffs' MCA Agreement with Defendants is unconscionable and unlawful, and therefore void and unenforceable;

    b)    Declaring Plaintiffs' MCA Agreement with Defendants to be a usurious loan in violation of the laws of New York and thus void and unenforceable;

    c)    That Defendants have violated 18 U.S.C. § 1962;

    d)    Awarding compensatory, direct, and consequential damages, including prejudgment interest, in an amount to be determined at trial or by summary determination;

    e)    Awarding treble damages;

    f)    Requiring Defendants to pay Plaintiffs' attorneys' fees and costs; and

g)      Any further relief deemed appropriate by the Court.

Respectfully submitted,

/s/ *Daniel W. Jackson*

Daniel W. Jackson, SBN 00796817
S.D. of Texas ID No. 20462
3900 Essex Lane, Suite 1116
Houston, Texas 77027
(713) 522-4435
(713) 527-8850 – fax
daniel@jacksonlaw-tx.com

Attorney in Charge for Plaintiffs

**OF COUNSEL:**

THE JACKSON LAW FIRM
Daniel J. Gierut, SBN 24101804
S.D. of Texas No. 3132105
3900 Essex Lane, Suite 1116
Houston, Texas  77027
(713) 522-4435
(713) 527-8850 – fax
dgierut@jacksonlaw-tx.com

BERENS & MILLER, P.A.
Barbara P. Berens, MN Bar #209788
Kari S. Berman, MN Bar #256705
3720 IDS Center
80 South Eighth Street
Minneapolis, Minnesota  55402
(612) 349-6171
bberens@berensmiller.com
kberman@berensmiller.com